**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>ISSAC ALAINS PAREDES,<br><br>Debtor. | **NOT FOR PUBLICATION**<br><br>Chapter 7<br><br>Case No. 16-10320 (MG) |
| BORIS MEDINA,<br><br>Plaintiff,<br><br>v.<br><br>ISSAC ALAINS PAREDES,<br><br>Defendant. | Adversary Proceeding<br><br>Case No. 16-01064 (MG) |

**MEMORANDUM OPINION AND ORDER AFTER TRIAL ORDERING ENTRY OF**
**JUDGMENT AND DENYING A DISCHARGE TO THE DEBTOR UNDER**
**SECTION 523 OF THE CODE**

*A P P E A R A N C E S:*

RIOS LAW FIRM, P.C.
*Attorney for Medina*
2560 Matthews Avenue
Bronx, NY 10467
By:     Jose L. Rios, Esq.

ANDERSON SHEN, P.C.
*Attorney for Paredes*
125-10 Queens Blvd., Suite 218
Kew Gardens, NY 11415
By:     Btzalel Hirschhorn, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the adversary complaint filed by Boris Medina ("Plaintiff" or "Medina"), as modified (the "Complaint," ECF Doc. # 2), seeking a determination of the nondischargeability under sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code (the "Code"), of an alleged debt of $50,000.00 incurred by Issac Paredes ("Defendant" or "Paredes") on December 26, 2011.  The debt arises out of an agreement (the "Agreement") that Medina signed with Paredes whereby Medina sought to purchase 25% of Paredes's restaurant, Tapas City Island (the "Restaurant"), on City Island in the Bronx.  A substantial portion of the value of the Restaurant consisted of its liquor license and the alcohol it sold and stored on the premises.  It is undisputed that the liquor license was held by a corporation named "Midnight Lounge, Inc."

When the parties sat down with Paredes's tax preparer, Mohammad Ashraf ("Ashraf"), to finalize the deal, Medina was presented with and signed the Agreement, which listed "Midnight Lounge, Inc." as the relevant entity.  Paredes presented Medina with other documents that included the name "Midnight Lounge, Inc."  Medina, believing that Midnight Lounge, Inc. owned the valuable liquor license, was then given a purported certificate of his 25% stake in the Restaurant, which included the name "Midnight Lounge **1**, Inc." [hereinafter, "Midnight Lounge 1, Inc."]—not "Midnight Lounge, Inc."  Paredes failed to disclose to Medina that Midnight Lounge, Inc.—the owner of the liquor license—had been dissolved in July 2010.

The Court has considered all the relevant testimony and evidence, and finds and concludes that Paredes incurred a debt of $50,000.00 to Medina, and that Paredes enticed Medina to enter into the transaction by actual fraud, false representations or false pretenses.  As explained below, "actual fraud," within the meaning of section 523(a)(2)(A), requires only that

2

the defendant acted with reckless disregard for the truth, which the Court finds Paredes did in

this case.

Therefore, a judgment will be entered in favor of Medina and against Paredes in the

amount of $50,000, and the debt is not dischargeable.

## I.    BACKGROUND

### A.    Factual Findings

#### 1.    *The Parties*

Paredes originally incorporated Midnight Lounge, Inc. on October 19, 2001.  (PX–2.)

Midnight Lounge was a club, and held a liquor license.[1]  This was Paredes's first foray into the

restaurant business, and after roughly one year, the restaurant closed.  On July 28, 2010, for

reasons not explained by Paredes, New York dissolved the corporation Midnight Lounge, Inc.

(PX–2.)  The corporation was reincorporated by Paredes on July 16, 2012 (the "2012 Midnight

Lounge, Inc. Reincorporation," PX–4) more than seven months *after* the Agreement with

Medina was signed.  Curiously, Paredes offered no explanation why he later revived Midnight

Lounge, Inc. in 2012, if Midnight Lounge 1, Inc. was the true holder of the liquor license and

owner of the Restaurant.

Sometime in 2008, Paredes opened the Restaurant.  Paredes testified that he intended to

transfer the liquor license then held by Midnight Lounge, Inc. to a newly created corporation,

Midnight Lounge 1, Inc. (the "Midnight Lounge 1, Inc. Incorporation," PX–4).  Paredes never

did.  Paredes testified that he filed a certificate of assumed name (the "Certificate of Assumed

Name," DX–A) which states that Midnight Lounge 1, Inc. operated under the assumed name of

---

[1]      The liquor license was not placed into evidence; however, the Liquor Record (defined herein) makes clear
that the liquor license was held by Midnight Lounge, Inc.

Tapas City Island.  This document does not establish that Midnight Lounge 1, Inc. ever owned

the Restaurant or held the liquor license.

While Medina and Paredes dispute when they first met, it is undisputed that the two met

in connection with the work Medina performed at the Restaurant for Paredes.  At the time,

Medina was a software technician who installed point of sale ("POS") software in the Restaurant

for Paredes.  The POS system provided a customized computer system to the Restaurant that

allowed servers to place orders to the kitchen, and the POS system facilitated the Restaurant's

management of cashless payments by linking customer payments to the Restaurant's bank

account.

In connection with the installation of the POS system, Medina and Paredes discussed the

possibility of Medina investing in the Restaurant.  This first occurred when Medina made a

$4,500.00 loan to Paredes around mid-2011.  No documentary evidence of this loan exists.  The

parties' testimony regarding what occurred next greatly differs.  Medina contends that Paredes

asked him to invest in the Restaurant, while Paredes contends that Medina made the first inquiry

into investing.

Also in dispute is the value of the Restaurant's alcohol inventory.  Medina contends that

in 2011, the Restaurant's basement contained many cases of alcohol that Medina estimated were

worth up to $200,000.00, while Paredes testified that the Restaurant never stocked that much

alcohol.  Paredes testified that Medina expressed an interest in purchasing an interest in the

Restaurant, and that the amount of the alcohol on the premises at any one time was only around

30-50 bottles, worth, at most, several hundred dollars.  Medina testified that the value of the

alcohol weighed heavily in his decision to invest in the Restaurant, because he expected the sale

4

of food to be only 30% of the total revenue.  Paredes agreed that alcohol sales made up a

significant portion of the Restaurant's profits.

> 2. *The Agreement*

Medina ultimately agreed to purchase 25% of the Restaurant.  On December 26, 2011,

the parties met at Ashraf's office.  Ashraf drafted the Agreement and the Corporate Minutes.

Ashraf had a pre-existing relationship with Paredes, for whom he occasionally prepared tax

returns.

Medina testified that Paredes and Ashraf presented him with four documents: 1) the

Agreement; 2) a DTF–95[2] (the "DTF-95," PX–9); 3) a record showing that the liquor license was

active, was held in the name of Midnight Lounge, Inc. and would be effective for Midnight

Lounge, Inc. from January 1, 2012, through December 31, 2013 (the "Liquor Record," PX–8);

and 4) a typo-ridden document, "Minute of Metting Shoaeholders of Midnight Lounge Inc. DBA

Tapas City Island" (the "Minutes," PX–7) that purported to approve the sale of 25% of Midnight

Lounge, Inc. to Medina.  Medina testified that he relied on the Minutes, the Liquor Record, and

the DTF–95 (together, the "Agreement Documents") when signing the Agreement.  The parties

agreed that Medina would pay $50,000.00 to Paredes upon the signing of the Agreement and

another $50,000.00 in March 2011, in exchange for a 25% ownership interest in the Restaurant.

Medina credibly testified that he relied on the Agreement Documents when signing the

Agreement.  The Court finds that Medina reasonably and justifiably relied on these documents in

concluding that Midnight Lounge, Inc. owned the Restaurant and held a valid liquor license.

Medina then received shares (the "Shares," PX–5) which were marked "Midnight Lounge 1,

Inc." (*See* Shares.)

---

[2]      This form is issued by the state of New York to allow businesses to make certain changes for tax purposes.

Medina testified that although he noticed that the Shares said "Midnight Lounge 1, Inc.,"

he thought he was receiving shares of Midnight Lounge, Inc.  Paredes did not explain the

disparity in the name of the entity between the Shares and the Agreement.  Moreover, on

November 19, 2011, Paredes applied to renew the liquor license (the "Renewal," PX–1) for the

2012 and 2013 fiscal years in the name of "Midnight Lounge, Inc."  (Renewal at 8.)  The

Renewal application also indicated that, on November 10, 2009, Paredes had previously applied

for a liquor license in the name of Midnight Lounge, Inc.  (Renewal at 2.)

Medina testified that after signing the Agreement, he learned that Paredes was taking

money from the Restaurant and transferring the money into a construction business that he

owned with his brother.  Medina testified that after he became a purported part-owner of the

business, he was able to match the transaction records recorded in the POS system to the

Restaurant's bank records.  Paredes admitted that he did transfer money from the Restaurant to

his construction business *before* he signed the Agreement, but testified that he stopped doing so

after the parties signed the Agreement.[3]

Medina testified that he approached Paredes about the disparity between the POS records

and the Bank records.  Medina was concerned that an employee of the Restaurant was

improperly taking money from the Restaurant, so the parties installed security cameras to see

whether this was true.  Medina eventually learned, however, that Paredes was taking money from

the Restaurant and transferring it to his construction business.  According to Medina, Paredes

transferred money *after* Medina acquired his interest in the Restaurant.  The Court credits

Medina's version of events.

---

[3]    Paredes maintained that he told Medina that he was transferring money out of the Restaurant to the
construction business prior to the signing of the Agreement.

Medina testified to confronting Paredes about the improper transfer of funds.  Medina

said that Paredes then agreed to return the $50,000.00 that Medina had already paid and to cancel

the Agreement.  According to Medina, Paredes failed to repay the money as promised.

Medina alleges that Paredes failed to convey anything of value after signing the

Agreement, because Midnight Lounge, Inc. did not exist at the time of the Agreement.  Medina

alleges Paredes deceived him by misrepresenting which entity held the liquor license and by

delivering worthless Shares because Midnight Lounge 1, Inc. did not own the Restaurant or the

liquor license.  Paredes concedes that the Agreement, on its face, promised a delivery to Medina

of shares of Midnight Lounge, Inc.  Paredes explained that the Agreement is riddled with typos.

Paredes argues that the Court should read this failure to include a "1" in the Agreement as one of

many typos, essentially having the Agreement read "Midnight Lounge 1, Inc."  The Court rejects

this argument.

### B.    Procedural History

On October 12, 2012, Medina filed an action in New York State Supreme Court (the

"New York Court"), *Medina v. Paredes, Midnight Lounge Inc., Midnight Lounge 1 Inc., and*

*Mohammad Ashraf*, Case No. 208332/2012, asserting claims for fraud, breach of contract, breach

of fiduciary duty, declaratory judgment, and other state law causes of action.  (Complaint at ¶ 9;

ECF Doc. # 1–1 (Exhibit Summons and Complaint in state action).)  On January 21, 2013,

Justice Barone entered an order granting a default under New York CPLR Section 3215.  (ECF

Doc. # 1–2.)  Paredes moved to vacate this order, but Justice Barone denied that motion.  (ECF

Doc. # 13 (Exhibit Decision in state action).)  The New York Court held an inquest on February

16, 2016.  Paredes did not appear.  The court awarded damages of $204,500.00 with interest

from March 21, 2012.  (ECF Doc. # 1–4 (Exhibit Minutes of Inquest).)  Unfortunately,

unbeknownst to Medina and the New York Court, Paredes had filed his chapter 7 petition on

7

February 11, 2016.  Because of the automatic stay, the inquest and award of damages were a

nullity.

Medina filed this adversary proceeding on May 10, 2016.  Medina's lawyer argued that

Medina was entitled to summary judgment denying a discharge based on the New York Court

ruling and damages award.  (*See* Complaint.)  Paredes filed a motion to dismiss (the "Motion to

Dismiss," ECF Doc. # 6) asserting that because the New York Court made no determination

regarding the issue of fraud, there was no basis to deny a discharge under any of the subsections

of section 523(a) of the Code.  (Motion to Dismiss at ¶ 26.)  After additional procedural

wrangling, the Court granted the Motion to Dismiss in part, dismissing the counts under sections

523(a)(4), 523(a)(6) (with leave to amend and re-plead), and 727(a)(3).  (ECF Doc. # 17.)  The

Court concluded that because of the bankruptcy filing, the New York Court ruling on damages

did not have any preclusive effect, but Medina could proceed with his claims for

nondischargeability under sections 523(a)(2)(A) and 523(a)(6) of the Code.

## II.    LEGAL STANDARD

### A.    Section 523(a)(2)(A) – Actual Fraud, False Representation, False Pretenses

"In view of the fresh start policy of the Bankruptcy Code, exceptions to the

dischargeability of debts should be narrowly construed in favor of a debtor."  *Varble v. Chase (In

re Chase)*, 372 B.R. 133, 136 (Bankr. S.D.N.Y. 2007) (internal citation and quotations omitted).

When the liability that the debtor seeks to discharge was incurred due to the debtor's fraud, the

Bankruptcy Code precludes a discharge, "affording relief only to an honest but unfortunate

debtor."  *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (internal citations and quotation marks

omitted).  Section 523(a)(2)(A) excepts from a discharge under section 727 of the Bankruptcy

Code

(a) . . . any debt—

>    (2) for money, property, services, or an extension, renewal or
>    refinancing of credit, to the extent obtained, by—
>
>>    (A) false pretenses, a false representation, or actual fraud,
>>    other than a statement respecting the debtor's . . . financial
>>    condition[.]

11 U.S.C. § 523(a)(2)(A).

To sustain a prima facie case under section 523(a)(2)(A) for false representations, a creditor must establish five elements: "(1) the debtor made a false representation, (2) the debtor knew the representation was false at the time it was made, (3) the debtor made the representation with the intent to deceive the creditor, (4) the creditor justifiably relied on the representation, and (5) the creditor sustained loss or damage as the proximate consequence of the false, material misrepresentation." *See Chase Bank, USA, N.A. v. Vanarthos (In re Vanarthos)*, 445 B.R. 257, 262 (Bankr. S.D.N.Y. 2011); *see also Owens v. Owens (In re Owens)*, 2005 WL 387258, at *1–2 (Bankr. S.D.N.Y. 2005); *Charell v. Gonzalez (In re Gonzalez)*, 241 B.R. 67, 71–72 (Bankr. S.D.N.Y. 1999); *Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991). The creditor bears the burden of proving these elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (2002). Failure to prove any of the elements is "fatal to a creditor's case." *See Schwartz*, 130 B.R. at 416 (citing *Schwalbe v. Gans*, 75 B.R. 474, 483 (Bankr. S.D.N.Y. 1987)).

In *Field v. Mans*, 516 U.S. 59, 70 (1995), the Supreme Court established that the terms within section 523(a)(2)(A) should be interpreted using the understanding of those terms at the time the statute was enacted. The Supreme Court looked to the definition of fraudulent misrepresentation found in the Restatement (Second) of Torts (1976) to define actual fraud:

>    Since the District Court treated [the defendant's] conduct as amounting to
>    fraud, we will look to the concept of "actual fraud" as it was understood in

9

1978 when that language was added to § 523(a)(2)(A).  Then, as now, the
most widely accepted distillation of the common law of torts was the
Restatement (Second) of Torts (1976), published shortly before Congress
passed the [Bankruptcy Reform] Act [of 1978].

*Id.*

Thus, "[t]he Court looks to the common law of torts, as embodied in the Restatement
(Second) of Torts, in construing the elements of § 523(a)(2)(A)." *Lubit v. Chase (In re
Chase)*, 372 B.R. 125, 130 (Bankr. S.D.N.Y. 2007).  For the purposes of section 523(a)(2)(A), a
"false representation" means that "(1) the defendant made a false or misleading statement (2)
with intent to deceive (3) in order for the plaintiff to turn over money or property to the
defendant." *Frishberg v. Janac (In re Janac)*, 407 B.R. 540, 552 (Bankr. S.D.N.Y. 2009).  In
certain circumstances, omissions can qualify as false representations.  For example, half-truths
can be actionable under section 523(a)(2)(A):  "A false representation can be shown through
either an express statement or through an omission where the circumstances are such that
disclosure is necessary to correct what would otherwise be a false impression." *Signature Bank
v. Banayan (In re Banayan)*, 468 B.R. 542, 574–75 (Bankr. N.D.N.Y. 2012) (citations omitted);
*see* RESTATEMENT (SECOND) OF TORTS § 529 (1976) ("A representation stating the truth so far as
it goes but which the maker knows or believes to be materially misleading because of his failure
to state additional or qualifying matter is a fraudulent misrepresentation.").  It does not matter if
the debtor believes that the undisclosed facts do not affect the value of the bargain.  *See*
RESTATEMENT (SECOND) OF TORTS § 529, *cmt. b* (1976) ("Whether or not a partial disclosure of
the facts is a fraudulent misrepresentation depends upon whether the person making the
statement knows or believes that the undisclosed facts might affect the recipient's conduct in the
transaction in hand.  It is immaterial that the defendant believes that the undisclosed facts would

10

not affect the value of the bargain he is offering.  The recipient is entitled to know the

undisclosed facts in so far as they are material and to form his own opinion of their effect.").

The Court also considers whether Paredes acted with "intent to deceive."  Paredes's

counsel initially argued that only actual intent to deceive by Paredes can satisfy the intent

element of a claim under section 523(a)(2)(A).  During argument, however, counsel

acknowledged that reckless disregard for the truth satisfies the intent element.

Courts recognize that intent to deceive can be difficult for a creditor to prove through

direct evidence.  Rarely will the debtor admit that he intended to deceive a creditor.  Therefore,

"intent to deceive may be inferred when the totality of the circumstances presents a picture of

deceptive conduct by the debtor, which indicates that [he] did intend to deceive and cheat the

[creditor]."  *Hong Kong Deposit and Guar. Co. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 53

(S.D.N.Y. 1990) (citations omitted); *see Voyatzoglou v. Hambley* (*In re Hambley*), 329 B.R. 382,

396–97 (Bankr. E.D.N.Y. 2005) ("[I]t is well established that intent to deceive may be

established through circumstantial evidence and inferred from the totality of the evidence

presented.").

A number of circuits, including the Second Circuit, have held that intent to deceive under

section 523(a)(2) can be satisfied if the debtor acted with reckless disregard for the truth, with

the recklessness of the debtor's behavior determined from the totality of the circumstances.  *See,

e.g.*, *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 301 (2d Cir. 1996)

("[I]ntent to deceive can be inferred from the totality of the circumstances, including reckless

disregard.") (applying its ruling to section 523(a)(2)(B)); *In re Cohn*, 54 F.3d 1108, 1118–19 (3d

Cir. 1995) ("[T]he intent to deceive can be inferred from the totality of the circumstances,

including the debtor's reckless disregard for the truth."); *Equitable Bank v. Miller (In re Miller)*,

11

39 F.3d 301, 305 (11th Cir. 1994) ("A bankruptcy court may look to the totality of the

circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor

submitted a statement with intent to deceive."); *Driggs v. Black (In re Black)*, 787 F.2d 503, 506

(10th Cir. 1986) ("The creditor must establish that a materially false writing was made

knowingly with the intent to deceive . . . .  However, the requisite intent may be inferred from a

sufficiently reckless disregard of the accuracy of the facts.").  Accordingly, the debtor's

credibility is an important factor in finding or rejecting fraudulent intent.  *See Waterbury Cmty.*

*Fed'l Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662, 669 (Bankr. N.D.N.Y. 1981).

As discussed below, the Court concludes that Paredes acted with reckless disregard for the truth.

### B.      Section 523(a)(6)—Willful and Malicious Injury

Section 523(a)(6) provides that a debt is nondischargeable when that debt results from

"willful and malicious injury by the debtor to another entity or to the property of another entity."

11 U.S.C. § 523(a)(6).  Put another way, in contrast to section 523(a)(2)(A), injuries inflicted

negligently or recklessly are an insufficient basis to deny a debtor a discharge under the statute.

*See Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998) (holding that the conduct must be "willful,"

and analogizing willfulness with words such as "voluntary" and "intentional" as used in tort

law).  While sections 523(a)(2)(A) and 523(a)(6) are distinct, the Supreme Court has recognized

that "overlap appears inevitable" between the two sections, and the Court has declined to create

an "artificial definition of actual fraud merely to avoid narrow redundancies in § 523 that appear

unavoidable."  *See Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1588 (2016) (internal

citations and quotation marks omitted).

"The terms willful and malicious are separate elements, and both elements must be

satisfied."  *Soliman v. Vyshedsky (In re Soliman)*, 539 B.R. 692, 698 (Bankr. S.D.N.Y. 2015)

(internal citation and quotation marks omitted).  "To establish that a debtor acted willfully under

section 523(a)(6), the plaintiff must demonstrate that the injury in question was a deliberate or

intentional injury, not merely a deliberate or intentional act that leads to injury." *Geiger*, 523

U.S. at 61–62.  Negligence and recklessness are insufficient under section 523(a)(6).  *See In re*

*Soliman*, 539 B.R. at 699.  Rather, this section incorporates the common law meaning of willful,

which is established when "[an] actor desires to cause consequences of his act, or that he

believes that the consequences are substantially certain to result from it."  RESTATEMENT

(SECOND) OF TORTS § 8A (1965).  Thus, the debtor must engage in conduct where he actually

intends to injure the party, or engages in conduct where the consequences are "substantially

certain" to result therefrom.  *See In re Soliman*, 539 B.R. at 699.

"To establish that a debtor acted maliciously, the plaintiff must prove that the debtor's act

was 'wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or

ill-will.'"  *Id.* (quoting *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir.

1996)).  Courts use a "totality of the circumstances" test, but malice is implied when "anyone of

reasonable intelligence knows that the act in question is contrary to commonly accepted duties in

the ordinary relationships among people, and injurious to another."  *In re Soliman*, 539 B.R. at

699.

### III.    DISCUSSION

Here, the Court finds that Paredes acted in reckless disregard of the truth of the

statements he made when he entered into the Agreement with Medina.  Specifically, Paredes

acted in reckless disregard of the truth: the statements contained in the Agreement and

Agreement Documents were false and misleading because they gave the false impression that

Midnight Lounge, Inc., a corporation that the Paredes knew no longer existed, owned the

Restaurant and held a liquor license.  Paredes, at least recklessly, conveyed shares of a

corporation, Midnight Lounge 1, Inc., that he knew did not have a liquor license.  Nor was there

13

evidence that Midnight Lounge 1, Inc. owned the Restaurant.  Therefore, Medina incurred a debt

of $50,000 within the meaning of the Code.  Paredes did not deliver the correct shares (which, in

any event, had no value because the corporation had been dissolved).  Because Paredes acted in

reckless disregard of the truth, the debt is nondischargeable under 523(a)(2)(A).  Medina

reasonably relied on the statements and representations Paredes made.  Paredes likewise omitted

to state facts necessary to make the statements he did make not misleading.  Half truths are

likewise actionable in this context.  In light of this concludsion, it is unnecessary for the Court to

reach the question whether the debt is nondischargeable because Paredes's conduct was "willful

and malicious" under 523(2)(6).

### A.        Paredes Incurred a Debt by Failing to Deliver the Correct Shares

Medina and Paredes agree that Medina wanted to invest in the entity with the liquor

license.  Medina argued that this was Midnight Lounge, Inc., and Paredes argued that this was

Midnight Lounge 1, Inc.  The Agreement plainly required the delivery of shares in Midnight

Lounge, Inc.; those shares were never delivered to Medina (and, of course, they would have been

worthless had they been delivered).  The liquor license was in the name of Midnight Lounge,

Inc.

Had the agreement gone through as planned, it seems clear that this would have been an

investment and not a debt.  However, that is not what happened.  The Midnight Lounge, Inc.

Dissolution makes it clear that there were no shares of Midnight Lounge, Inc. to convey to

Medina when the parties signed the Agreement.  Paredes could not convey what was not in

existence.  Paredes plainly conveyed shares of Midnight Lounge 1, Inc., as is clear from the face

of the Shares.  The Shares Medina received were not what he bargained for.  Both the Minutes

and the TP–95 given to Medina represent that Midnight Lounge, Inc. controlled the Restaurant.

Medina received neither an interest in the Restaurant nor any interest in the liquor license, and

14

therefore, Paredes failed to perform his end of the contract.  Thus, Paredes incurred a $50,000.00

debt to Medina on December 26, 2011 when Paredes failed to deliver the correct entity under the

Agreement.[4]

### B.        Paredes Recklessly Disregarded the Truth of the Statements in the Agreement Documents

Paredes argues that if the Court does not treat the omission of the number "1" from the

agreement as a typo, the Court would penalize a typographical error by turning it into a

$50,000.00 nondischargeable debt.  Here, the totality of the circumstances indicate that (i)

Paredes acted in reckless disregard of the truth, (ii) Medina relied on the truth of those

Agreement Documents, and (iii) Paredes's recklessness caused Medina to give Paredes

$50,000.00.  Paredes was responsible for the incorporation of both corporations, and Paredes

owned the Restaurant; he was in a far better position to know which entities existed at the

relevant times, and which entities owned the Restaurant and the liquor license.  Thus, the Court

concludes that the elements for false pretenses are met.

While it is true that the Agreement Documents are full of typographical errors, the Shares

are quite clearly marked Midnight Lounge 1, Inc., in bold, large typeface print.  Paredes offered

no explanation why those Shares were marked Midnight Lounge 1, Inc.  The Court credits

Medina's testimony that he did not think there was an issue receiving the Shares marked as

Midnight Lounge 1, Inc.  Furthermore, Medina had no idea that there were two separate entities,

whereas Paredes was in the best position to know that there were two separate entities, and so at

the very least, Paredes was reckless by paying no attention to the different corporate entities.

---

[4]        Alternatively, the debt was incurred when the Paredes agreed to return the $50,000.00 to Medina after they continued to have confrontations regarding the shifting of money from the Restaurant to Paredes's construction business.

Paredes offered no explanation why he delivered the incorrect Shares, and Medina's credible

testimony established that Paredes was reckless when he did so.

Paredes testified that he hired Ashraf to draft the agreement.  In New York, "[t]he

principle of contra proferentem is a doctrine under which courts will construe an ambiguity in

agreement against the drafter."  *D'Amato v. Five Star Reporting, Inc.*, 80 F. Supp. 3d 395, 412

(E.D.N.Y. 2015).  The Court finds this principle helpful in interpreting the typo, if ambiguous,

against Paredes, who, this Court finds, had a relationship with Ashraf based on previous work

that Ashraf did for Paredes.

Moreover, the Minutes make the same mistake, twice, listing the corporation as Midnight

Lounge, Inc., not Midnight Lounge 1, Inc.  Further, the fact that Paredes did not notice the

difference in the corporate names does not exonerate him.  "[T]he debtor cannot hide behind the

allegation that he merely skimmed the loan documents and did not notice the error in the name of

the corporate borrower."  *Resolution Trust Corp. v. Roberti (In re Roberti)*, 183 B.R. 991, 1006

(Bankr. D. Conn. 1995) (internal citation and quotation marks omitted).  If anything, the fact that

the Paredes did not pay attention to the names in the documents raises a strong inference of

recklessness.

> The defendant's statement that unfortunately, I didn't look at [the wrong name on the loan documents] the way I should have is not only an admission of a reckless indifference to the truth but also a glaring understatement. Indeed, *since he was trying to obtain a $250,000.00 corporate loan from Coastal Savings, and since he knew or should have known that the bank could not collect that debt from the corporation named in the loan documents if it did not exist, it was incumbent upon the defendant to verify that the named corporate borrower was an existing corporation.*

*FDIC v. Roberti (In re Roberti)*, 201 B.R. 614, 628 (Bankr. D. Conn. 1996) (emphasis added)

(internal citations and quotation marks omitted).  One typo may be explainable, but all three of

the omissions favor Paredes because they allowed Paredes to convey the Shares in an entity that did not hold the liquor license (and perhaps not the Restaurant) in exchange for Medina's $50,000.00.  The Court credits the testimony of Medina over Paredes, and so declines to correct one "typo," let alone three.

Other conduct of Paredes also shows that he was reckless.  Under New York law, an entity without a liquor license cannot sell alcohol.  N.Y. Alco. Bev. Cont. Law § 108 (McKinney) ("No licensee except the holder of a license to manufacture alcoholic beverages shall keep or permit to be kept . . . on the licensed premises any alcoholic beverage except the alcoholic beverages which he is permitted to sell . . . .")  New York strictly construes the requirements of this law.  *See generally Fortino v. State Liquor Auth.*, 273 N.Y. 31, 33 (1936) (holding that when a state investigator found two bottles of wine on premises licensed to sell only beer, there existed sufficient grounds to revoke a liquor license).  Paredes, however, operated the Restaurant without a valid liquor license since the license was held in the name of a dissolved corporation.[5]  While Paredes eventually did reincorporate Midnight Lounge, Inc. (PX–3) in July of 2012, this would show that Paredes was plainly aware of the differences in the two corporations.  Thus, Paredes was plainly reckless in operating and selling the business.  Because a discharge has been denied under section 523(a)(2)(A), it is unnecessary to reach the question whether Paredes's conduct was willful under 523(a)(6).

## IV.    CONCLUSION

For the reasons explained above, the Court finds and concludes that Paredes is indebted to Medina in the amount of $50,000.  Judgment will be entered in this amount, and the Judgment is not dischargeable.

---

[5]    The Court makes no determination whether Paredes would have been subject to penalties under the New York Alcoholic Beverage Control Law.

17

Medina's counsel shall settle a judgment consistent with this Opinion within 14 days in

accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**

Dated:    June 15, 2017
          New York, New York

_____*Martin Glenn*_____

MARTIN GLENN
United States Bankruptcy Judge